# EXHIBIT E

# Deposition Transcript

Case Number: 7:25-cv-09821-PMH
Date: September 17, 2026

In the matter of:

## JEFF HUBBARD PRODUCTIONS, INC. v 43 NORTH BROADWAY LLC

# CURTIS J. FRASCA - 30(b)(6)

CERTIFIED COPY

Reported by:
Stacey Raikes

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------x

JEFF HUBBARD PRODUCTIONS, INC.,

Plaintiff,

- versus -

Case No.: 7:25-cv-09821-PMH

43 NORTH BROADWAY LLC,

Defendant.

-----------------------------------------x

43 NORTH BROADWAY LLC,

Counterclaim-Plaintiff,

- versus -

JEFF HUBBARD PRODUCTIONS, INC.,

Counterclaim-Defendant.

-----------------------------------------x

VIDEOTAPED VIDEOCONFERENCE 30(b)(6)DEPOSITION

OF:

CURTIS J. FRASCA

(via Steno Connect)

Thursday, September 17, 2026

10:01 a.m. ET - 4:58 p.m. ET

REPORTED STENOGRAPHICALLY BY:

Stacey E. Raikes, RMR, CRR

Job No.: 3154022

* * * * * * * * * * * *

VIDEOTAPED VIDEOCONFERENCE STENOGRAPHIC DEPOSITION of CURTIS J. FRASCA, taken in the above-entitled matter, pursuant to Rule 30(b)(6), before STACEY E. RAIKES, a stenographic machine reporter, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public of the State of New York, via Steno Connect on Thursday, September 17, 2026, commencing at 10:01 a.m. ET.

* * * * * * * * * * * *

A P P E A R A N C E S: (via Steno Connect)

COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP
BY: LEO M. LICHTMAN, ESQ. (via Steno Connect)
- and -
BY: ISABELLA HYUN, ESQ. (via Steno Connect)
60 Broad Street, 30th Floor
New York, New York 10004
(212) 974.7474
llichtman@cdas.com
Attorneys on behalf of the
Plaintiff/Counterclaim-Defendant

COZEN O'CONNOR LLP
BY: LISA FERRARI, ESQ. (via Steno Connect)
- and -
BY: FREDERICK CHU, ESQ. (via Steno Connect)
3 World Trade Center
175 Greenwich Street, 55th Floor
New York, New York 10007
(212) 297.2699
lferrari@cozen.com
Attorneys for Defendant/Counterclaim-Plaintiff

ALSO PRESENT:
Jenice Vierra-Garza, Legal Videographer

# I N D E X

## CURTIS J. FRASCA


| EXAMINATION BY | PAGE |
|---|---|
| Attorney Lichtman | 8, 298 |
| Attorney Ferrari | 297 |


## E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiff/Counterclaim Defendant Jeff Hubbard Productions Inc.'s Notice of Deposition of 43 North Broadway | 29 |
| Exhibit 2 | Webpage | 42 |
| Exhibit 3 | Documents Bates stamped 43NB00001 - 3 | 52 |
| Exhibit 4 | Amended Complaint | 88 |
| Exhibit 5 | Documents Bates stamped 43NB00083 - 88 | 106 |
| Exhibit 6 | Defendant 43 North Broadway LLC's Responses and Objections to Plaintiffï¿½S First Set of Interrogatories | 128 |
| Exhibit 7 | Documents Bates stamped 43NB00004 - 30 | 135 |
| Exhibit 8 | Documents Bates stamped 43NB00047 - 81 | 157 |
| Exhibit 9 | Documents Bates stamped 43NB00701 - 712 | 167 |
| Exhibit 10 | Documents Bates stamped 43NB000686 - 697 | 172 |
| Exhibit 11 | Documents Bates stamped 43NB00033 - 37 | 179 |

E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 12 | Documents Bates stamped 43NB00038 - 41 | 188 |
| Exhibit 13 | Documents Bates stamped 43NB00042 - 46 | 201 |
| Exhibit 14 | Defendant 43 North Broadway LLC's Responses to Plaintiffï¿½s Requests to Admit | 214 |
| Exhibit 15 | Complaint | 240 |
| Exhibit 16 | Complaint for Copyright Infringement | 243 |
| Exhibit 17 | Excel spreadsheet | 264 |
| Exhibit 18 | Defendant 43 North Broadway LLCï¿½s Answer, Affirmative Defenses, and Counterclaims | 274 |
| Exhibit 19 | Documents Bates stamped 43NB00714 - 715 | 286 |

STIPULATIONS

IT IS HEREBY STIPULATED, by and between the attorneys for the respective parties hereto, that all rights provided by the CPLR, and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, is reserved.

IT IS FURTHER STIPULATED AND AGREED that the filing of the deposition is waived.

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any Notary Public with the same force and effect as though signed and sworn to before this court but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116 of the CPLR, and shall be controlled thereby.

IT IS FURTHER STIPULATED AND AGREED that the witness shall read and sign the original deposition transcript within 60 days upon receipt.

* * * * * * * * * * *

---------------------------------------------------

P R O C E E D I N G S

10:01 a.m. ET

---------------------------------------------------

THE VIDEOGRAPHER: Good morning. We are on the record at 10:01 a.m. eastern time, September 17, 2026, to begin the deposition of Curtis Jason Frasca, as an individual and as 43 North Broadway LLC 30(b)(6) in the matter of Jeff Hubbard Productions, Incorporated versus 43 North Broadway LLC.

The venue of this case is United States District Court Southern District of New York. The case number is 7:25-cv-09821-PMH. This deposition is taking place via Zoom.

The legal videographer is Jenice Vierra-Garza here on behalf of Steno, whose business address is 315 West 9th Street, suite 807, Los Angeles, California, 90001.

Could counsel please identify yourselves and state whom you represent?

ATTORNEY LICHTMAN: Yes. I'm Leo Lichtman with Cowan, DeBaets, Abrahams & Sheppard representing the plaintiff and counterclaim defendant.

ATTORNEY HYUN: Isabella Hyun with Cowan, DeBaets, Abrahams & Sheppard representing the plaintiff and counterclaim defendant.

ATTORNEY FERRARI: Good morning. Lisa Ferrari and Frederick Chu of Cozen O'Connor representing the defendant and the witness.

THE VIDEOGRAPHER: Thank you, Counsel.

Would the court reporter please identify herself and swear in the witness?

(Whereupon, the Certified Stenographic Reporter administered the oath to the witness.)

CURTIS JASON FRASCA,

after having presented a New York State Driver's License, having been first duly sworn or affirmed, was examined and testified as follows:

THE COURT REPORTER: Can you please state your name for the stenographic record.

THE WITNESS: It's Curtis Jason Frasca.

THE COURT REPORTER: Thank you.

Mr. Lichtman, whenever you're ready, the floor is yours.

ATTORNEY LICHTMAN: Thank you very much.

EXAMINATION ON BEHALF OF THE PLAINTIFF
BY ATTORNEY LICHTMAN:

Q. And good morning, Mr. Frasca.

A. I'm not familiar.
Q. What about Paula Cosi?
A. Perhaps.
Q. Okay. Going to 1.01, Excluded Assets, it says that, "All assets not identified in Section 1.01 will remain with Seller."
Was it your understanding that 43 North was, essentially, just purchasing some of the assets as opposed to, essentially, acquiring the company?
A. We did not acquire -- it was an Asset Purchase Agreement. So we did not acquire the company.
Q. Do you know if Fuel 2000 still operates?
A. I don't know.
Q. Got it.
But your understanding was that this wasn't -- you didn't understand this to be a deal to, essentially, wrap up Fuel 2000's --
A. No, this is actually the opposite. It's an Asset Purchase Agreement.
Q. Uh-huh.
Under 1.03, Assumed Liabilities, do you see that?
A. I do.
Q. And what do you understand that to mean?

A. Purchaser will assume the -- I'm going to read the document so.
Q. Sure.
A. Assume liabilities. "As of the closing, Purchaser will assume the liabilities and obligations of the Seller arising from and after the closing date, regard to Contracts (the 'Assumed Liabilities')."
Q. Do you know what contracts it -- contracts is capitalized.
Do you know what that means?
A. Contracts is capitalized? Yes, it is. I do not.
Q. Do you know if there's a list of contracts that would have been assumed?
A. At this time, I do not know.
Q. Do you know whether they would be listed on any schedule?
A. They would be, yes. I assume that -- well, sorry. I assume it would be.
Q. Would that --
A. If they existed.
Q. Would that schedule -- I mean, would that be something that would have been part of the Asset Purchase Agreement?

A. I think 25 to 30,000.
Q. Okay.
A. Something in that range.
Q. And in terms of royalty administration, you're the only individual that handles that?
A. Correct.
Q. And how do you keep track of what royalties are owed to what artists?
A. So royalties, if there are artist royalties owed, the royalty agreements would be sent to GR&F, who then would ingest them in to the royalty system, and then a royalty port would be generated.
Q. Got it.
Do you understand a royalty obligation to be a liability and obligation under a contract?
A. I do.
Q. Let's go to 1.05, the, "Purchase Price." It says it was for $.
Is that -- any reason to doubt that's the number?
A. The document's the document so.
Q. Got it.
Was there any back and forth over the purchase price?

North Holdings?
A. Uh-huh.
Q. Is that the same company as 43 North Broadway?
A. No.
Q. If 43 North Holdings held certain rights, would 43 North Broadway hold those rights?
A. Say that one more time. If 43 Holdings?
Q. If 43 North Holdings held certain rights, would 43 North Broadway hold rights?
A. In the -- I don't think so, no.
Q. There would have to be some kind of deal between 43 North Holdings and 43 North Broadway; right?
A. Perhaps.
Q. Are you aware of any deal between Music Marketeers, Inc. and Marketteers, Ltd. concerning the Vogues Masters?
A. Currently? No.
Q. Okay. So, in this agreement, which is with Red Dog Express, when did you first see this agreement?
ATTORNEY FERRARI: Could you scroll to all four pages?
ATTORNEY LICHTMAN: Yup.

ATTORNEY FERRARI: So we can see it before you ask about it?

ATTORNEY LICHTMAN: Yup, yup, yup. I'm sorry.

(Pause.)

A. Yeah, it would have been around the same time. Is there more?

Q. No.

A. No, it would have been around the same time. This was all in one folder --

Q. Uh-huh.

A. -- that was, again, you know, like I said, from Fuel when they sent over the original docs post the acquisition. So, in that timeframe, perhaps some before, if they were digitized with Verse Music.

Q. Uh-huh.

A. Or Verse Music Group, whoever you want. I mean, so it could be, I mean --

Q. Okay.

A. -- sometime in that range.

Q. Can you read the first paragraph?

A. "For consideration, the seller and purchaser hereby agree as follows:"

Seller agrees to sell to the purchaser the

Q. What is it?
A. I'm sorry, can you --
Q. Yeah.
A. -- just make it a --
Q. Yes, yes, yes. I'm making it smaller because when it gets bigger, for whatever reason --
A. Okay, I understand. It's fine.
Okay, that's perfect. Thank you. When you get older, they get more grainy.
Q. I know.
A. Okay, thank you.
Q. So this is a document that says Master Purchase Agreement, lessor, Nick Cenci d/b/a Co & Ce Records, licensee, I guess, or license, Red Dog Express, Inc., and it says Master Purchase Agreement so it's a Master Purchase Agreement.
A. Uh-huh.
Q. And do you see that there's like language that's been crossed out with handwriting --
A. Yeah.
Q. -- over it?
A. I do.
Q. Do you know who crossed out the language?
A. I do not.
Q. Do you know who added the handwriting?

A. I do not.
Q. Okay. And do you have any copy of this agreement without the handwriting?
A. Currently, no.
Q. Okay.
A. No, I do not.
Q. I'm going to zoom in a little bit more here. How do I -- wait. Yeah, okay.
Can you see where there's some language crossed out?
A. Kinda.
Q. Yeah. I think kinda is a fair -- fair response.
Can you read what is crossed out next to Red Dog Express?
A. Not really.
Q. What if I go in farther? I feel like it's like CSI here.
A. I know. And, I mean, well, it looks like P-U-R and the middle stuff and then an R at the end.
Q. Okay. Fair enough.
A. So I can't read it.
Q. Yeah, fair enough. Sorry for the eye exam right after you took eyedrops.
Okay. What's your understanding of what

this document is conveying?

A. The document is the document. I'll just read it. I mean, it says license or agrees to -- well, no, I can't see it, but something -- the nonexclusive right throughout the world in perpetuity. The master recordings listed on Schedule A of this agreement for the sole purpose of manufacturing and distributing sound recordings, records, phonograph recordings, and sound recordings, all forms of records and reproduction by which sound may be recorded now known or which may thereafter become known, manufactured, or sold, primarily for home use, jukebox, or use in or in means of transportation, including, okay, and it goes on. Other medium, other devices, artistic performances, manufactured or sold primarily for home use, jukebox use, or in means of transportation, and, et cetera; right?

So it, to me, it's a -- it's a -- it says it's a Master Purchase Agreement.

Q. Of what?

A. Of sound recordings.

Q. Of what interest in the sound recording?

A. Percentage?

Q. No, just what interest in the sound

recording? Like, what right was being purchased?
A. The nonexclusive right throughout the world in perpetuity, the master sound recordings.
Q. So not a purchase of the copyright; is that accurate?
A. Oh, that's accurate. Yes.
Q. Okay. It was basically -- is it your understanding this was, essentially, one party was saying to the other party you have a nonexclusive right to use the master recordings in these ways?
ATTORNEY FERRARI: Objection. Calls for a legal conclusion.
A. I mean, if I read the agreement.
Q. Yeah.
A. That's what it's doing. It's transferring rights on a nonexclusive basis worldwide in perpetuity.
Q. Do you know, at this time -- sorry. Excuse me.
Do you know at the time --
ATTORNEY LICHTMAN: Let me withdraw this, again.
BY ATTORNEY LICHTMAN:
Q. If I go to the bottom, do you see it's dated June 29th, 1989?

A. I see that, yes.
Q. Do you know whether Nick Cenci held the copyright rights in the Vogues Masters on that date?
A. I don't.
Q. Do you know who else held the copyrights in the Vogues Masters on that date?
A. I do not.
Q. Is there any information you have that would suggest that somebody else held the masters on that date?
A. That I have, I don't believe so. I don't have any.
Q. Got it.
And I'm not asking you to confirm that he did, but --
A. Yeah.
Q. -- sitting here today, you're just not aware of any facts to dispute that he held the Masters?
A. As far as I can recall, yeah, no, I -- it seems like, yeah.
Q. Okay. And just to confirm, because we've gone through a lot of documents now, is it your understanding that 43 North -- the ownership rights that 43 North has in the Vogues Masters trace back

to this document?

ATTORNEY FERRARI: Objection. Form.

A. The chain of title traces it back to this document.

Q. Okay.

A. And the other documents and the APA between Fuel and 43 North transferring rights.

Q. Uh-huh. Now, in Paragraph 1, do you see the word digital anywhere?

A. No.

Q. Okay.

A. I --

Q. In Paragraph 1, do you see anything about public performance?

A. I don't.

Q. Do you see anything about transmission?

A. I don't.

Q. And just remind me, so you've been in the music industry since?

A. Way too long.

Q. Essentially, high school; right?

A. Yeah. So the '70s.

Q. So if you were looking at this agreement, you know, as a music industry veteran --

A. Yup.

Q. Yeah, no, I get it. So I'll just ask you:
Are you aware of any rights in the Vogues Masters that 43 North holds apart from the rights that Nick Cenci granted to Red Dog Express, Inc.?
A. Currently, no.
Q. Okay. I'm going to move to Request No. 18. And it says, "Admit that no other person or entity has assigned the copyright rights in the Vogues Masters to you," and 43 North denies.
Do you know what an assignment of copyright is?
A. I do.
Q. And what is it?
A. It's when somebody assigns the copyright -- one party assigns the rights to another party.
Q. Can you assign -- when you're referring to assigning the rights, does that also include a license?
A. It can, yes.
Q. Is that your understanding as to Request for Admission No. 18?
A. Request for Admission No. 18. "Admit that no other person or entity has assigned the copyright rights in the Vogues Masters to you."